UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>     Plaintiff, | Case No. 2:19-cr-20026<br>Hon. Gershwin A. Drain |
| v. | **SENTENCING MEMORANDUM** |
| D-2    SURESH REDDY KANDALA,<br>     Defendant. | |

_____/

| | |
|---|---|
| U.S. Department of Justice<br>By: Timothy P. McDonald (P-64562)<br>Assistant United States Attorney<br>211 W. Fort Street, Suite 2001<br>Detroit, Michigan 48226<br>(313) 226 9100<br>e-mail: timothy.mcdonald@usdoj.gov | Law Office of Edwar A. Zeineh, PLLC<br>By: Edwar A. Zeineh (P-71923)<br>Attorney for Defendant, Suresh Reddy Kandala<br>2800 E. Grand River Avenue, Suite B<br>Lansing, Michigan 48912<br>(517) 292-7000<br>e-mail: zeinehlaw@gmail.com |

_____/

**DEFENDANT'S SENTENCING MEMORANDUM AND
REQUEST FOR DOWNWARD VARIANCE IN ACCORDANCE WITH 18 U.S.C. § 3553**

**I.    INTRODUCTION:**

Mr. Kandala has and will continue to accept responsibility for the course and conduct for which he engaged. The question remains when will the Government accept its responsibility for creating the quagmire in which Mr. Kandala, as well at approximately 16,000 other F-1 student visa holders, found themselves in 2017. The sentencing in this case has to reconcile the wrongs by Mr. Kandala, with the wrongs by the United States Department of Education in <u>creating</u> this predicament. On September 5, 2019, Mr. Suresh Reddy Kandala is scheduled to be sentenced by this Honorable Court for the crime of Conspiracy to Commit Visa Fraud and Harbor Aliens for Profit in violation of 18 U.S.C. § 371.  Mr. Kandala accepted guilt for this crime and has accepted full responsibility for his wrongful conduct.  This memorandum is intended to assist the Court in fashioning an appropriate sentence by setting forth the Defendant's position on the case



facts and applicable guidelines, as well as to provide the Court more insight into Mr. Kandala's character and background. He seeks to have this Court sentence him sufficiently, but no greater than necessary, to fulfill the objectives of sentencing. As argued within this memorandum, Mr. Kandala is seeking a downward variance as Mr. Kandala believes that exploration of the 3553(a) factors will substantiate a lesser sentence from that called for by the guidelines. Mr. Kandala is seeking a sentence of not more than six months, or alternatively, time served, so that he may begin the deportation process.

## II. HISTORY AND CHARACTER OF SURESH REDDY KANDALA:

Generally, extensive letters of support showing sound moral character would be referenced in this section. All of Mr. Kandala's relevant social ties are in India. Access to those individuals is extremely limited, however, it has been made clear to Undersigned Counsel that Mr. Kandala's family misses him, supports him, loves him, and wants him home.

Evidenced by his lack of criminal history, sound academic pursuits, and robust love for this country, the thought that Mr. Kandala is a good human being is legitimate. He began his pursuit of academic grander in a small third-world village with limited resources. He set his sights of academic achievement as high as the Kangchenjunga Mountains. Mr. Kandala completed the equivalent to high school at the young age of 16 years old. Mr. Kandala completed Sri Indu College of Engineering and Technology in Sherigudu, India, where he obtained his bachelor's degree. He worked for a period of time as a site engineer in India, earning approximately $150.00 per month. In furtherance of his academic pursuits, Mr. Kandala applied for an F-1 Student Visa. To obtain an F-1 Student Visa, an applicant must establish the following:

- You must be enrolled in an "academic" educational program, a language-training



> program, or a vocational program;
> - Your school must be approved by the Student and Exchange Visitors Program, Immigration & Customs Enforcement
> - You must be enrolled as a full-time student at the institution
> - You must be proficient in English or be enrolled in courses leading to English proficiency
> - You must have sufficient funds available for self-support during the entire proposed course of study
> - You must maintain a residence abroad which you have no intention of giving up.[1]

The applicant then has to attend an in-person interview at the local United States Embassy. This process requires a significant investment of time, money, and resources. A person applying for and receiving a F-1 Student Visa has made a significant financial commitment prior to even purchasing a plane ticket to come to the U.S.A. Mr. Kandala <u>lawfully</u> obtained an F-1 Student Visa. This allowed Mr. Kandala to <u>lawfully</u> enter and remain in the United States of America so long as certain criteria were maintained. Initially, Mr. Kandala was enrolled at a University in Philadelphia, Pennsylvania. He stayed only one week in Philadelphia because the weather "was too cold". He subsequently transferred to Northwestern Polytechnic University (NPU) in Freemont, California. NPU was accredited by the Accrediting Council for Independent Colleges and Schools (ACICS). ACICS was an authorized accreditation agency through the United States Department of Education. In 2015, Mr. Kandala earned his Master's Degree in Electrical Engineering. Mr. Kandala was lawfully engaged in OPT programming through NPU in 2016. In January 2017, Mr. Kandala set to extend his OPT programming. However, on December 12,

---

[1] https://www.uscis.gov/working-united-states/students-and-exchange-visitors/students-and-employment



2016, the United States Department of Education terminated ACICS accreditation authority[2] thereby affecting approximately 250 schools and upwards of 16000 F-1 Student Visa holders.

### III. NATURE AND CIRCUMSTANCES OF OFFENSE:

All the evidence seems to indicate the individuals involved in this Indictment entered the United States lawfully on a F-1 Student Visa. Upon the actions of the Department of Education terminating the ACICS accrediting authority, these individuals, along with approximately 16,000 other students, were limited to three options. First, complete the program authorized under their current I-20, second, transfer schools, or third, depart the United States. Internet chaos ensued as students tried to salvage their personal and financial investments in American Education. It is important to note that the actions of the Department of Education were challenged in Federal Court. On March 23, 2018, the United States District Court for the District of Columbia ruled in favor of ACICS to the extent that the Education Secretary violated the Administrative Procedures Act. *See Accrediting Council for Independent Colleges and Schools v Betsy Devos in her official capacity as Secretary of the United States Department of Education of the United States Department of Education.* Case No 16-2248 (RBW).

ICE, through the use of a fake, however, "accredited"[3] university, attracted hundreds of students to enroll in a program that did not offer classes, but offered I-20's. Many students, knowing this was improper, elected to take this as a remedy to the predicament created by Government. Alleged in two separate Indictment s is the conduct of 8 individuals acted as recruiters and/or referral sources to the "University". The allegations asserted that the indicted individuals recruited almost six hundred students and that each of the Defendants named in the two Indictments received referral fees in a "pay to stay" scheme. As evidenced by a series of

---

[2] https://www.ed.gov/news/press-releases/education-department-establishes-enhanced-federal-aid-participation-requirements-acics-accredited-colleges
[3] The UCA directed students to confirm accreditation status via www.uccsc.org



guilty pleas, the government is clearly able to establish a criminal conspiracy showing that some of the individuals referred students to the "University", took money in exchange for such work, knowing the "University" did not legitimately comport with the requirements of the F-1 Visa program. It would befuddle even the most skeptical onlookers if the Government took the position that these individuals knew or should have known that this "University" was not real in its concept. It is however clear that the individuals knew the "University" was not operating by the rules.

Mr. Kandala's role is significantly different than the balance of those indicted. Mr. Kandala's factual basis was limited in nature because his role was very limited. By way of summary only, Mr. Kandala, in very plain language, admitted guilt in open court to knowing that the "University" was not operating within the rules, enrolled to keep his I-20, he knew Mr. Santosh Sama was referring students and collecting referral fees, and that the students, including himself did not have to attend classes, and that he helped collect money for Mr. Sama in the amount of $20,000 referencing Mr. Sama's referral fee and communicated, on a singular occasion while Mr. Sama was out of the country and at Mr. Sama's direction, with the "University" regarding a list of individuals that Mr. Sama had referred.

It is important to note, contrary to the Governments assertions, Mr. Kandala's role did not include the following:

1. Mr. Kandala never kept any of the money Santosh handed him.
2. Mr. Kandala never referred "not even one person to be a student at the University of Farmington"
3. Mr. Kandala never "recruited even one student for the University of Farmington".



    4. Mr. Kandala was never paid "any money to get students for the University of Farmington.

Corroboration of Mr. Kandala's position can be found in Exhibit A: **Polygraph Examination Report.** Mr. Kandala was asked the above questions by Examiner Christopher Lanfear of Lanfear Consulting. Mr. Lanfear concludes that it is his expert opinion that "based on the analysis of the polygraph examination of Suresh Reddy Kandala, that he is being ***truthful*** to the pertinent test questions".[4] Moreover, Mr. Lanfear's opinion is further confirmed by two separate computerized scoring systems. It was determined that "no deception" was detected from Mr. Kandala with less than a .01 probability of deception.[5]

Mr. Kandala was an enrolled student at the "University". He paid tuition in the amount of $10,000.00; $7,500.00 went to Mr. Sama and $2,500.00 went to the Government.

### IV. PRESENTENCE INVESTIGATION REPORT AND RECOMMENDATION:

Mr. Kandala has reviewed the final pre-sentence investigation report.

Defendant has timely preserved and asserted objections to the PSIR, eight of which remain in dispute. Objection number 3, 4, and 5 relates to the scoring of USSG § 2L1.1b(2)(B). Objection number 6 relates to the scoring of USSG § 3B1.1(C) "Aggravating Role" vs USSG § 3B1.2(a) "Mitigating role". Objection number 7 relates to the overall scoring of the guidelines range and is resolved by the determinations of the above referenced objections.

To the extent the balance of the Defendants' objections do not affect the scoring of the guidelines, Defendant respectfully preserves such objections and reserves arguments as necessary.

---

[4] Polygraph Examination Report August 23, 2019 at Pg 2 "Opinion"
[5] *Id*



**Objection number 3,4, and 5 relates to the scoring of USSG §2L1.1b(2)(B):**

USSG §2L1.1b(2)(B):

(B) Specific Offense Characteristics

    (2) If the offense involved the smuggling, transporting, or harboring of six or more unlawful aliens, increase as follows:

Number of Unlawful Aliens Smuggled, Transported, or Harbored Increase in Level

    (A) 6-24 add 3

    (B) 25-99 add 6

    (C) 100 or more add 9.

The Government relies on four points to support this enhancement of +9 levels under USSG § 2L1.1b(2)(B):

1. Mr. Kandala recruited and/or referred students directly to the "University";

2. Mr. Kandala was with Mr. Sama when Mr. Sama received $20,000.00 from the UCA for referrals that Mr. Sama made;

3. Mr. Kandala, on February 22, 2018, contacted the "University" to inquire about the status of a list of students for and on behalf of Mr. Sama;

4. Pursuant to USSG § 1B1.3(B), Mr. Kandala is accountable for the acts of other conspirators that are within the scope of jointly undertaken criminal activity and are reasonably foreseeable.

As evidenced by the structure of the Governments argument to this point, it is clear that Mr. Kandala did not recruit or refer any students to the "University". The Government has failed to point one specific application or witness that labeled Suresh Reddy Kandala as the referral source. Simply calling Mr. Kandala a recruiter or referral source is insufficient to meet the burden of proof in this instance. Moreover, Mr. Kandala has maintained the position that he never referred or recruited anyone to the "University". This was not part of his factual basis



before this Honorable Court. His truthfulness to this fact is corroborated by a ***voluntary polygraph examination*** conducted on August 23, 2019 by Christopher Lanfear.[6]

Reliance on Mr. Sama's statement at the time of plea, or at any other time during the investigation, that Mr. Suresh Reddy Kandala was recruiting students is not a diligent pursuit of justice by the Government. If the Government is so inclined to rely on the representations of Mr. Sama it must consider the January 16, 2018 phone recording where Mr. Sama identified his "partner" as being a "Suresh", a guy "from India", a "childhood friend", that is not (at the time) enrolled in the "University", and attends NYIT (New York Institute of Technology).[7]

Mr. Suresh Kandala was enrolled at the "University" in March of 2017, long before the January 16, 2018 recording. He did not meet Mr. Sama until he lived in California. Mr. Kandala was never enrolled in NYIT. He is however, one of many "Suresh's" from India. This is not new information to the Government. They have the benefit of knowing Mr. Sama's true partner. A person that meets the exact description of Mr. Sama's "partner" - "Suresh" is included in the Governments ROI # 56.

Lastly, ROI # 048 memorialized the recorded conversation from January 16, 2018 with Mr. Sama and the UCA. ROI # 048 indicated that the recruiter was identified as yet another, "Suresh LNU", not Suresh Reddy Kandala.

Mr. Kandala was with Mr. Sama at the January 22, 2018 meeting in which Mr. Sama collected $20,000.00 for referring students. Mr. Kandala did take possession of that money. Mr. Kandala contended that he returned the entirety of the money he possessed to Mr. Sama once

---

[6] Exhibit A: Poly August 23, 2019 Lanfear Consulting
[7] January 16, 2018 Audio recording of UCA and Mr. Sama; Referenced ROI # 048


they left the "University". His truthfulness to this fact is corroborated by a ***voluntary polygraph examination*** conducted on August 23, 2019 by Christopher Lanfear.[8]

Mr. Kandala did engage the "University" on February 22, 2018 at the behest of Mr. Sama to inquire as to the status of enrollment of other students provided by Mr. Sama. This was part of Mr. Kandala's factual basis at the time of his plea. Both the Government and the Probation Department rely on the use of the word "we"[9] as means to further inculpate Mr. Kandala in this conspiracy. It is presented to this Honorable Court as some form of admission that Mr. Kandala is "part of the team". The use of the word "we" must be placed in the proper context before it is considered. Mr. Kandala is discussing the "University" open enrollment period, as it was *limited* to the month of March. This is consistent with the audio recording made with Mr. Sama and UCA on January 16, 2018 that discussed the admissions period, closing specifically in the month of March. Mr. Sama and the UCA discussed the list referenced in the Government's argument. The use of the word "we" by Mr. Kandala is not some form of admission by the Defendant that he was more so engaged in the conspiracy than he lets on. He, as a student member of the "University" was simply representing his association to the "University", not the criminal conspiracy.

Moreover, if the Government is going to rely on transcripts of the recording, it should properly transcribe the recording for the Court. The last statement transcribed on A-3 made by the UCA reads as "Well, yeah talk to Santosh and then let me know what 50 you want or whatever". This reads as if Mr. Kandala has the decision-making ability to include the 50 he wanted. A proper transcription of the statement should read, "Well, yeah talk to Santosh and then

---

[8] Poly August 23, 2019 Lanfear Consulting
[9] A-2 PSIR: USA Office Response Transcript and Argument



Page **9** of **20**

let me know what 50*, or* you want ***to email us*** or whatever"[10]. There is no reason to rely on this out of context improperly transcribed recorded phone call.

Lastly, the Government contends that scoring of +9 levels is appropriate because Mr. Kandala should be held accountable for the acts of other conspirators that are within the scope of the jointly undertaken criminal activity and are reasonably foreseeable. The Government relies on the role of Mr. Sama and his recruitment/referral of approximately 500 students. In review USSG § 1B1.3(B), a Defendant, in a jointly undertaken criminal activity, is only accountable for the conduct of others that was:

i. Within the scope of the jointly undertaken criminal activity;

ii. In furtherance of the criminal activity; and

iii. Reasonably foreseeable in connection with the criminal activity. [11]

When the conduct of others does not meet any one of the criteria set forth in subdivisions (i) through (iii), the conduct is not relevant conduct under this provision.[12]

Immediately apparent is the failure of the Government to establish that 100 or more individuals were harbored as a result of the overall conspiracy because, as established by the February 22, 2018 recorded phone call of Mr. Kandala and UCA, the enrollment was limited to 50 people; more than 50 people was not, under section iii - reasonably foreseeable in connection with the criminal activity. If that was the limit established by the "University" how could Mr. Kandala ever expect that 100 or more individuals could have been recruited? Since all three elements must be met, the +9 level enhancement should automatically fail.

Beyond that, the Government is not able to show the extent of the jointly undertaken criminal activity exceeded the scope of Mr. Kandala's factual basis, which showed a limited role,

---

[10] February 22, 2018 recorded call UCA and Kandala
[11] USSG § 1B1.3(B) FN 3(A)
[12] *Id*



and would not lead him to believe that 100 plus individuals obtained the benefit of the fake I-20's therefore able to illegally stay in the USA.

Unlike other Defendants, Mr. Kandala never referred other students. His documented involvement in the conspiracy started January 22, 2018 to and until February 20, 2018. After that, no interaction in furtherance of the conspiracy was documented. He did not engage in a similar scheme of recruiting students to the "University" for a referral fee. It seems as if each substantive co-defendant had its own method of conducting the illegal activity. Mr. Kandala had very limited coordination activity other than the two very brief instances. He never received any money from the conspiracy.[13] He in fact paid tuition to Mr. Sama and the "University" totaling $10,000.00.[14] He was not a decision maker. This is evidenced in the communication with the UCA on February 20, 2018 for which the UCA directed Mr. Kandala to advise Mr. Sama which 50 people wanted.[15] His degree of participation in the conspiracy is limited to the two instances established in the PSIR and at the time of his plea. His knowledge of the scope of the scheme was limited without any facts to prove otherwise.

As such, Mr. Kandala should be score 0 points under 2L1.1b(2)(B). This argument also addresses the Defendants objections 3, 4, and 5.

Alternatively, if the Court finds that Mr. Kandala should be held accountable for the students Mr. Sama referred, as referenced in the February 20, 2018 phone call, then the enhancement should not exceed 25-99 persons or +6 levels, as it was impossible for Mr. Kandala to foresee enrollment of more than the 50 students.

**Objection number 6 relates to the scoring of 3B1.1(C) "Aggravating Role" verses 3B1.2(a) "Mitigating role":**

---

[13] Polygraph Examination August 23, 2019
[14] *Id*
[15] PSIR A-3 Transcript of February 20, 2018 Phone Call



With regard to objection number 6, Defendant is entitled to a 4 level reduction because the Defendant was a minimal participant in any criminal activity. USSG § 3B1.2(a). As argued in-depth above, Mr. Kandala should not be held accountable under USSG § 1B1.3(B) for the acts of other co-conspirators. USSG § 3B1.2(a) Note 3(A) makes it clear to apply the reduction in instances where a Defendant is *substantially less culpable than average participant*. Contrary to the Governments opinion, consideration of the 1B1 factors do not attribute accountability to Mr. Kandala for the acts of the co-conspirators. *See argument above*. The mitigating role reduction is intended for Defendants similarly situated to Mr. Kandala who are plainly among the least culpable of those involved in the conduct of a group. Reduction of 4 levels is consistent to Note 4 of this Guideline.

As this is a fact-based determination the Court should consider the follow non-exhaustive list:

> (i) the degree to which the defendant understood the scope and structure of the criminal activity;
>
> (ii) the degree to which the defendant participated in planning or organizing the criminal activity;
>
> (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
>
> (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;
>
> (v) the degree to which the defendant stood to benefit from the criminal activity.
>
> The fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative. Such a defendant may receive an adjustment under this guideline if he or she is substantially



less culpable than the average participant in the criminal activity.[16]

As argued throughout, Mr. Kandala maintained a limited understanding of the scope and structure of the criminal activity, did not participate in the planning or organizing of the criminal activity outside of the February 20, 2018 phone call to the "University" where he acted as a messenger for the "University" and for Mr. Sama. He had zero decision making authority or influence. Mr. Kandala's documented involvement in the conspiracy, outside of his own enrollment at the "University", was from January 22, 2018 to February 20, 2018. Mr. Kandala did not receive money for his role in the conspiracy.[17] He was able to maintain his status in the Country. Though Mr. Kandala assisted in furtherance of the criminal activity, that conduct is not alonedispositive to a determination regarding a mitigating role as he was plainly less culpable than all other co-defendants.

With regard to Objection number 7, Defendant Kandala maintains his guidelines should be scored at an Offense Level 8 - 0-6 months. This affects paragraphs 32, 36, 57, and 77.

The sentence imposed on Mr. Suresh Kandala should be driven by the "overarching" command of 18 U.S.C. § 3553(a), which "instruct[s] district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." Kimbrough v United States, 552 U.S. 85,89 (2007). The Guidelines are advisory and in no sense does a Guidelines calculation engender a presumption that the attendant sentence is appropriate, let alone required. Gall v. United States, 552 U.S. 38, 45 (2007). In fact, courts "may not presume that the Guidelines range is reasonable" at all or that only "extraordinary circumstances … justify a sentence outside the Guidelines range." Gall, 552 U.S. at 47; see Nelson v. U.S., 555 U.S. 350, 350 (2009) ("The Guidelines are not only not mandatory on sentencing courts; they are

---

[16] USSG § 3B1 Commentary Note 3(C)
[17] Polygraph Examination August 23, 2019 Lanfear Consulting



also not to be presumed reasonable."); Rita v. United States, 51 U.S. 338, 351 (2007) ("sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply."). While the Court is instructed to use the Guidelines as an initial benchmark, they are only "one factor among several" that the Court should consider, and can and should play no role in the sentencing decision when doing so would undermine Federal sentencing objectives. Kimbrough, 552 U.S. at 90. It follows that courts may consider whether a Guideline does not reflect the considerations outlined in § 3553(a), reflects an unsound judgment, does not treat defendant characteristics in the proper way, or that a different sentence is otherwise appropriate. Rita, 51 U.S. at 350-51. Judges also "may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." Kimbrough, 552 U.S. at 101. In sum, to fulfill its duty, the Court must conduct its own independent review of the sentencing factors and exercise discretion in fitting the sentence in this case to Mr. Suresh Kandala's individual circumstances. Mr. Suresh Kandala believes that the exploration of the 3553(a) factors will result in a lesser sentence from that called for by the proposed guidelines. It is his hope that the Court will take into account his character, his acceptance of responsibility, and that the facts underlying his involvement in the conspiracy show a minimal role, and conclude that the sufficient sentence is not found in the advisory guideline range but well below it.

### V. DEFENDANT'S REQUEST FOR VARIANCE/CONSIDERATION OF 18 U.S.C. § 3553 FACTORS:

In this case the interchange between the guidelines and sentencing factors can readily address the appropriate sentence that the Defendant should receive in this case. The salient issue in this case is whether Mr. Suresh Kandala's sentencing guideline range accurately reflects where he ought to be sentenced. Therefore, we turn to the factors set forth by 18 USC §3553(a) to be considered when fashioning an appropriate sentence.



§3553. Imposition of a sentence

(a) Factors To Be Considered in Imposing a Sentence.—The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—

**(1) the nature and circumstances of the offense and the history and characteristics of the defendant**;
(2) the need for the sentence imposed—
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) **to afford adequate deterrence to criminal conduct**;
    (C) **to protect the public from further crimes of the defendant**; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.
(6) **The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct**

**The nature and circumstances of the offense and the history and characteristics of the defendant:**

The nature and circumstances of the offense are troublesome. There is no way to legitimize the criminal conduct of Mr. Kandala. But it is evident, supported by the facts, and corroborated by the polygraph examination that this Defendant's role was minimal in the overall conspiracy. Mr. Kandala never recruited any student. Mr. Kandala never referred any student. Mr. Kandala never received a discounted tuition as a result recruiting or referring students. Mr. Kandala did not get money for recruiting or referring students. Mr. Kandala paid tuition to the "University". Mr. Kandala is substantially less culpable than the average participant in the criminal activity. He had a mitigating role. He did not engage in the same substantive conduct as Mr. Sama or others. He did not participate in the planning or organizing of the criminal activity and exercised zero decision making authority or influence.



This Honorable Court will hear that Mr. Kandala attended a meeting, on January 22, 2018, with Mr. Sama was paid $20,000 for referring students. Mr. Kandala assisting in the counting of that money, placed some of the money in his pocket, and then left with Mr. Sama. As addressed in the polygraph report, Mr. Kandala did not keep for himself any of the money that Mr. Sama handed him at that recorded meeting.[18]

This Honorable Court will hear that Mr. Kandala contacted Under Cover Agents on February 20, 2018 at the direction of Mr. Sama. Mr. Sama was out of the Country at the time, Mr. Kandala was asked to speak with the "University". During that call, Mr. Kandala inquired about the status of group of students that *Mr. Sama* referred to the "University" as admissions of the school was limited to the month of March. The UCA advised Mr. Kandala to tell Mr. Sama that "Ali" would only give admissions to 50 students, "so to pick the 50 of however many he sends.[19]"

These are the two legitimate instances in which the Government is anticipated to assert as a basis to substantiate Mr. Kandala's involvement. The other basis in which the government is likely to present the theory that Mr. Kandala was a recruiter/referral source is that Mr. Sama said he was. In this instant case, Mr. Sama constantly engaged in inflammatory, and likely false, claims on a regular basis in hopes to get money from the UCA. Often times, his recorded communications with the UCA were laughable. Mr. Sama is simply not believable.

As argued in depth above, Mr. Sama identified to the UCA who his recruiting "partner" was, and it not Suresh Reddy Kandala.

The nature of Mr. Kandala's criminal activity is serious, however, is not the most serious that this Honorable Court will see throughout the balance of the sentencing phase relating to the

---

[18] Exhibit A: Polygraph August 23, 2019
[19] Transcripts A-3 PSIR



Page **16** of **20**

Co-Defendants. Mr. Kandala was a very low level, limited, co-conspirator who readily admits his guilt and seeks a sentence of time served.

**Deterrence of criminal conduct:**

Admittedly this is a very important consideration in the instant case and can be achieved in many ways which do not include a sentence within the proposed guidelines range.

Mr. Kandala has been incarcerated since January 30, 2019. Upon his release, Mr. Kandala will be deported to India. Mr. Kandala now has a Felony record. Mr. Kandala's ability to continue his academic pursuits in the United State are over. His ability to enjoy the freedoms of this great Country are gone.

It is extremely shortsighted to believe that the consequences of deportation mean simply returning home to enjoy the comforts a familiar land. Upon his return to India, his reputation, earning capacity, academic status, and social status will reach an all time low. He is likely to be shunned and branded with shame. Being deported because of a criminal conviction not only limits your ability to ever return to the United States, it restricts your ability to enter other countries around the world. As commonly known, a conviction in the United States affects even a U.S. Citizens ability to travel to other countries. This well traceable, clearly identifiable, conviction relating to immigration fraud from the United States of America will very much limit Mr. Kandala's ability to travel to any other countries in the world. This is a message that will resonate with foreign nationals.

Yes, this case, and consequences handed down will likely get attention of media outlets around the world. Coupled with the instability of the current Administrations policies relating to immigration, uncertainty of even law abiding schools maintaining accreditation, the



consequences in this case are so amplified that a minimum sentence will deter even the most courageous fraudster. So much so that it will likely deter an initial application.

Each one of these consequences sends a message to any individual seeking to commit immigration fraud upon the United States: do-not-do-it.

**To protect the public from further crimes of the defendant.**

The Defendant will be deported. He does not present a risk of further criminal activity against the Citizens of the United States. Depending on the sentence imposed by this Honorable Court, Mr. Kandala will either be permanently barred entering the United States, or at a minimum barred from seeking permission to enter the United States for at least 10 years.

**The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct:**

Sec. 3553(a)(6) requires the Judge to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. USSG Sec. 3553(a)(6).

In the instant case, Co-Defendant Barath Kakireddy was sentenced by this Honorable Court on August 22, 2019 after he pled guilty to Count 1 of the same Indictment for Conspiracy to Commit Visa Fraud and Harbor Aliens for Profit in violation of 18 U.S.C. § 371. Mr. Kakireddy was sentenced to serve 18 months in the Bureau of Prisons. This Honorable Court granted downward variance after considering the sec. 3553(a) factors. Mr. Kakireddy was credited for referring 93 similar situated students to the "University". He did not have a prior record. This Honorable Court believed he was significantly involved in the overall conspiracy. Mr. Kakireddy is facing deportation after conviction of this offense. Mr. Kakireddy's attributable profits was approximately $32,000.00. He was not placed on supervised released.



Mr. Naveen Prathipati was sentenced on Case 19-CR20024-01 on June 20, 2019 before this Honorable Court. Mr. Prathipati was sentenced to serve 12 months and 1 day in the Bureau of Prisons. This Honorable Court granted downward variance after considering the Sec 3553(a) factors. Upon information and belief, Mr. Prathipati was credited for referring 100 or more similar situated students to the "University", had a prior criminal record and will also be facing deportation after this conviction. Mr. Prathipati attributable profits are unknown to this Defendant. He was not placed on supervised released.

Mr. Kandala has a spotless criminal history. He entered in the United States lawfully. His involvement, though sufficient to warrant the conviction, was not so intimately involved in this overall conspiracy to warrant accountability for the entire scope of the criminal activity. Mr. Kandala took temporary possession of a referral fee payment intended for Mr. Sama. At the direction of Mr. Sama, Mr. Kandala communicated with the "University" staff to check on the status of students that SAMA referred, not Mr. Kandala. Mr. Kandala did not recruit any students to join the "University". He did not share in profits from the referrals fees. Mr. Kandala paid tuition, in part to Mr. Sama, and the balance to the "University". He was referenced approximately two substantive paragraphs in the 15 page Indictment . Compared to the already sentenced Defendants, Mr. Kandala is low man on the totem pole. Therefore, Mr. Kandala's sentence should be lower then the other Defendants. A disparity in sentencing in this case is created by the guidelines. The Court in *Kimbrough v United States* 552 U.S. 85 reasoned that the Court must consider "any unwarranted disparity created by the guidelines themselves. 552 U.S. at 108. As a result the sentence of Mr. Kandala should be below the guideline range.



## VI. CONCLUSION:

Defendant submits to this Honorable Court that a custodial sentence of no more than 366 days, or alternatively, time served so that Mr. Kandala can begin the deportation process, is a sentence that sufficiently, but no greater than necessary, fulfills the objectives of sentencing and properly balances the guidelines against the §3553(a) factors.

Respectfully submitted,

Dated: August 26, 2019

/s/ Edwar A. Zeineh
Edwar A. Zeineh (P-71923)
Law Office of Edwar A. Zeineh, PLLC
**Attorney for the Defendant**
**Suresh Reddy Kandala**
2800 E. Grand River Avenue Suite B
Lansing, Michigan 48912
Office: (517) 292-7000

