UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

United States of America,

No. 19-20026

Plaintiff,

Hon. Gershwin A. Drain

v.

**Offense:**

D-2 Suresh Reddy Kandala,

18 U.S.C. § 371
Conspiracy to commit visa fraud and
harbor aliens for profit

Defendant.

**Maximum Penalty:** Up to 5 years

**Maximum Fine:** $250,000

**Supervised Release:**
Up to 3 years

## <u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

Defendant Suresh Reddy Kandala is a foreign citizen who abused the student visa program so that he could remain and work in the United States illegally. Moreover, he and his co-conspirators recruited other foreign students to do the same. Accordingly, the United States of America respectfully recommends that the Court impose a sentence within Kandala's guidelines range of **33–41 months**, as calculated by the U.S. Probation Department. Such a sentence is necessary in light of the seriousness of the offense, the need to punish Kandala, deter Kandala and others

from committing the same misconduct, Kandala's personal characteristics and to avoid unwarranted sentencing disparities.

## I.   BACKGROUND

Defendant Suresh Kandala is a citizen of India who first traveled to the United States in 2014 on a temporary student visa known as an F-1 visa. (PSR ¶¶ 9, 43 and 44). Before he could obtain his F-1 visa, Kandala applied to study in the United States at a university through the Student and Exchange Visitor Program ("SEVP"), which is overseen by the Department of Homeland Security. (*Id.* at ¶ 10–11). Once accepted by a university—in this case Northwestern Polytechnic University (NPU)[1]—the school issued a "Certificate of Eligibility for Nonimmigrant Student Status," better known as a Form I-20. (*Id.* at ¶¶ 10–11, 49).

Kandala's Form I-20 permitted him to enter the United States, (*Id.* at ¶ 12), which he first did on December 28, 2014. (*Id.* at ¶ 44).   While in the United States, he used his Form I-20 for identification and proof of legal and academic status in the United States, and it also allowed for him to travel abroad and return to the United States. (*Id.* at ¶ 12). For his Form I-20 to remain valid, Kandala knew that he needed to maintain his status as a full-time student "making progress toward completion of

---

[1] *See* https://www.buzzfeednews.com/article/mollyhensleyclancy/inside-the-school-that-abolished-the-f-and-raked-in-the-cash (last visited August 29, 2019) (describing the "educational" practices of Northwestern Polytechnic University).

[his] field of study," whether at his original school or any school to which he later transferred. (*Id.* at ¶ 11); (*R*.79: Plea Hrg. Tr., 216).

Kandala's visa and Form I-20 also permitted him to participate in curricular practical training ("CPT"), which in essence permitted him to find gainful employment as long as he continued to attend classes and make academic progress toward his degree. (PSR, ¶¶ 14-15).

From February 2017 through January 2019, undercover agents from Homeland Security Investigations ("HSI") posed as employees of the University of Farmington ("the University"), located in Farmington Hills, Michigan. (PSR ¶ 16). The University had no instructors, no classes, and no educational activities. Rather, it was a fictitious university used by foreign citizens as a "pay to stay" scheme. (*Id.* at ¶ 17). Under the "pay to stay" scheme, foreign citizens would enroll with the University as "students," but they would take no classes nor attend any educational programs; instead, they would pay tuition so that the University would issue them Form I-20's that identified them as students making progress toward a degree, and if they desired, they could also seek gainful employment through the CPT program. (*Id.*).

On February 22, 2017, Kandala participated in a three-way telephone call with Santosh Sama, and an HSI undercover agent. During that call, Kandala asked about university fees and whether the university was accredited. When asked by the

undercover agent about his situation, Sama interrupted stating that they (Sama, Kandala and a third student) were "all together."   It should be noted that nine days earlier Sama had contacted the University and discussed the program's illegality with the undercover agent. During that call, Sama also inquired about the ability to be paid for recruiting his friends. Therefore, Sama presumably told Kandala about the nature of the University's pay to stay scheme prior to Kandala's 2/22/17 call.

To drive home the illegality of the arrangement, the undercover agent told Kandala that there were no classes and to use discretion when discussing the University during a March 1, 2017 phone call:

> UCA:        We received all your stuff.
>
> ****
>
> Kandala:    I spoke with Santosh. He told me that….uh…that I (unintelligible) on it…..did Santosh spoke with anything with you?
>
> UCA:        Santosh did speak to me but I want to make sure that we're on the same page, here.
>
> Kandala:    Yeah, yeah. I am on the same page (unintelligible) (laughs)
>
> UCA:        So, wanna make sure that you know…obviously you know, we are going to give you this and everything but….obviously you are not coming to classes or anything like that, right?
>
> Kandala:    Yeah.

4

UCA:        Ok, so you are good with that?

Kandala:    Yeah, yeah…same like Santosh.

UCA:        So another thing is do me a favor… if it ever comes to
            somebody asks you questions…especially
            Immigration…that's between us, right? Just tell them you
            are attending classes or anything like that if they ever ask
            you.

Kandala:    Yeah, yeah, yeah, yeah, yeah…. I am full-time student.

UCA:        You are a full time-student, perfect. You come here….
            because obviously if they were to find out, we could get
            into trouble.

            ****

UCA:        Do you want CPT on the first date?

Kandala:    Yeah, same like Santosh

On January 22, 2018, Kandala and Sama met with the undercover agent at the
University to accept payment for recruited students and discuss future recruitment
plans. The trio discussed various options for moving students to other schools.
Because Sama had connections with Silicon Valley University and Kandala with
NPU, they discussed whether they could collectively leverage those relationships to
reduce the number of students. (*1/22/18 Recorded Meeting 10:11:36 – 10:21:42*). In
fact, when the undercover agent asked if Silicon Valley had the "same kind of
arrangement as we have here where you don't have to go to class," Kandala

explained the difference. *Id*. at 10:16:21. In other words, Kandala actively participated in this discussion and demonstrated his intimate knowledge and familiarity with the criminal activity underway.

The conversation then turned to the amount of money Santosh had received from the students he recruited. Sama produced a notebook that contained a ledger of at least 100 students that he and his co-conspirators' recruited. Sama's ledger is depicted below:



(1/22/18 recorded meeting 10:22:25)

The ledger not only listed the number of students referred, but also delineated students who were planning to enroll in the future. Sama acknowledged receiving $59,000 from the students he recruited. In fact, when asked by the undercover officer what he did with that $59,000.00, Sama said that he gave some to his "brother" and he placed his arm around Kandala.  Kandala responded, "We are sending a lot of money to India." (*1/22/18 Recorded Meeting - 10:24:55 – 10:25:48*). The meeting

culminated with the undercover agent paying Sama $20,000, which given Sama's $500 per student fee, represented the recruitment of 40 students. Below, Sama and Kandala can be seen counting $20,000 received in exchange for recruiting students from an HSI agent (whose image is obscured):



After counting out the money, Kandala placed it in his coat pocket:



The following day, Kandala and Sama returned to the University and met with the undercover agent. During the conversation, the undercover agent asked Kandala

and Sama whether they deposited the $20,000. Below is a video excerpt and partial transcript of that discussion that demonstrates Kandala kept a portion of the money:



(Click on the play button in the bottom left corner to activate)

UCA:       Did you deposit the money?

Sama:      $13,000

UCA:       Huh?

Sama:      $13,000 distributed.

UCA:       To what?

Sama:      $5000 to my friend (unintelligible), $5000 to my brother, $3000 to one more friend - $13,000 … $7000 [remaining]. [turning towards Kandala] $3000 in his pocket, $3000 in my pocket.

UCA:       That's a lot of money to have in your pocket

Kandala:   (laughs)

8

On February 20, 2018, Kandala called the University in an attempt to get his and Sama's recruited students admitted into the University. An excerpt of the call is below:

Kandala:       This is Suresh, Santosh's friend. Santosh Reddy Sama.

UCA:           How can I help you?

Kandala:       Uh…like we met you like in Michigan, I come with Santosh you don't remember me?

                      ****

Kandala:       Santosh is in India right now…. he told me like that. We have pending admissions for the March, so he sent an email to Ali so but he didn't receive any response so that's why I call you.

UCA:           Yeah, Ali sent him an email this morning saying he could only….um….give admission for 50 students and to pick 50 students and he would send them their admission letter.

Kandala:       Oh, ok, ok, thank you.

                      ****

UCA:           What is your last name, again?

Kandala:       Kandala. Suresh Reddy Kandala.

                      ****

UCA:           If you want to tell him that Ali is only going to give 50 students, so to pick the 50 out of however many he sends.

Kandala:       Only 50?

9

| UCA: | Only 50. |
|---|---|
| Kandala | Oh my God...there is a lot of students…hundred students…their ending the OPT, it's time...with the new admissions…but it's too late….yeah maybe I will tell him. |

…..

| UCA: | Well, yeah talk to Santosh and then let me know what 50 or you want to email us or whatever. |
|---|---|
| Kandala: | OK, thank you. |

A few days later, Sama emailed the first list of 25 students:

**From:** santoshreddy sama
**To:** Ali Milani @UF; carey.ferrante⬛⬛⬛⬛⬛⬛armington.edu
**Subject:** Acceptance first list of 25 students
**Date:** Thursday, February 22, 2018 12:52:07 PM

Hi Ali below are 25 students of first please work on it and send acceptance ASAP

(<em>Student names omitted</em>)

---

Kandala has pled guilty to conspiring to commit visa fraud (18 U.S.C. § 1546(a)) and harboring aliens for profit (8 U.S.C. § 1324) in violation of 18 U.S.C. § 371; 18 U.S.C § 2—without the benefit of a Rule 11 plea agreement, although the government did offer one. (PSR, ¶¶ 1, 6). Kandala's co-conspirators are the foreign citizen "students" he recruited and his co-defendants. (*Id.* at ¶¶ 18, 19).

The maximum sentence for his offense is not more than five years'

imprisonment, a maximum fine of $250,000, and an applicable term of supervised

up to three years. (PSR, p. 2; ¶¶ 53, 56, 61).

## II.   SENTENCING GUIDELINES CALCULATIONS AND § 3553(a) FACTORS

In determining an appropriate sentence, the Court should use the Sentencing

Guidelines as a "starting point and the initial benchmark." *United States v. Lalonde*,

509 F.3d 750, 763 (6th Cir. 2007) (quoting *Gall v. United States*, 552 U.S. 38, 49

(2007)). Indeed, a sentence within the guidelines range carries a "rebuttable

presumption of reasonableness." *United States v. Buchanan*, 449 F.3d 731, 734 (6th

Cir. 2006). This is so because the guidelines "represent nearly two decades of

considered judgment about the range of sentences appropriate for certain offenses."

(*Id.* at 736) (Sutton, J., concurring). In particular, the guidelines aggregate the

"sentencing experiences of individual judges, the administrative expertise of the

[Sentencing] Commission, and the input of Congress…." *Id.*

Beyond the Guidelines, the Court should consider all of the factors set forth

in 18 U.S.C. § 3553(a). *Gall*, 552 U.S. at 49–50. The § 3553(a) factors include:

(1) the nature and circumstances of the offense and the history and
characteristics of the defendant;
(2) the need for the sentence imposed—
    (A) to reflect the seriousness of the offense, to promote respect
    for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant;
    and

> (D) to provide the defendant with needed educational or
> vocational training, medical care, or other correctional
> treatment in the most effective manner; [and]
>
>            ***
>
> (6) the need to avoid unwanted sentence disparities among defendants
> with similar records who have been found guilty of similar conduct….

18 U.S.C. § 3553(a).

### A.    Kandala's Sentencing Guidelines

The government agrees with the Probation Department that Kandala's total offense level is 20 and his criminal history category is I, which result in a sentencing guideline range of **33–41 months**. (PSR, ¶ 57).

### 1.    Defendant harbored 100 aliens or more

Kandala argues that he should be assessed 0 points under USSG § 2L1.1(b)(2)(B) because he did not recruit or refer students to the University. But he accepted $20,000 in payment for the recruitment of 40 students and facilitated the enrollment of 50 more. Therefore, at a minimum, he is responsible for harboring 90 students – whether or not he personally recruited them or aided and abetted Sama. However, the conspiracy as a whole harbored over 600 aliens. (R.1: Indictment, 1). Because Kandala is responsible for the acts of other conspirators that are within the scope of jointly undertaken criminal activity and reasonably foreseeable, he should be assessed 9 points under USSG § 2L1.1(b)(2)(C) for harboring 100 or more aliens.

USSG § 1B1.3(B) provides that relevant conduct includes:

"In the case of jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with other, whether or not charged as a conspiracy), all acts or omissions of others that were-

> (i)     within the scope of the jointly undertaken criminal activity,
>
> (ii)     in furtherance of that criminal activity, and
>
> (iii)     reasonably foreseeable in connection with that criminal activity;

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for the crime.

Conduct of others "that meets all three criteria set forth in subdivisions (i) through (iii)"—*i.e.* is "within the scope" of, "in furtherance" of, and "reasonably foreseeable" in connection with jointly undertaken criminal activity—"is relevant conduct under this provision" for which a defendant may be held accountable. U.S.S.G. § 1B1.3 cmt. n.3(A). In order to determine whether these criteria are met, this Court must first determine the scope of the criminal activity the particular defendant agreed to undertake. (*Id*. n.3(B)).

In *United States v. Donadeo*, 910 F.3d 886, 895-896 (6th Cir. 2018), the Sixth Circuit adopted the Seventh Circuit's relevant factors list in *United States v. Salem*, 657 F.3d 560, (7th Cir. 2011) to determine the scope of the criminal activity a

defendant agreed to jointly undertake. The factors include: "(1) the existence of a single scheme; (2) similarities in modus operandi; (3) coordination of activities among schemers; (4) pooling of resources or profits; (5) knowledge of the scope of the scheme; and (6) length and degree of the defendant's participation in the scheme. *Id*. at 895.

In this case, the factors support a finding that the scope of Kandala's jointly undertaken criminal activity is broad enough to include the conduct of his co-conspirator, Santosh Sama – who alone recruited almost 500 students. *United States v. Sama*, 19-cr-20026 – (R.80: Plea Tr. 271).

First, Kandala and Sama were engaged in a single scheme - to refer students to the University of Farmington in exchange for money or reductions in tuition. Second, Kandala and Sama jointly harbored aliens in the same manner; they facilitated the receipt of fraudulent I-20's for their "students" knowing that these aliens remained in the United States in violation of law. Kandala and Sama also coordinated their activities. Kandala was referred to the University by Sama. (R.78: Plea Tr. 189-190). In addition, during his plea colloquy, Kandala acknowledged working with Sama to recruit students. (R.79: Plea Tr., 221, 223). Kandala and Sama pooled their resources. The fifth factor is the knowledge and scope of the scheme. As noted above, Kandala admitted working with Sama in recruiting students to the University for money. This factor supports a finding that the scope of Kandala's

jointly undertaken criminal activity was broad enough to include Sama's conduct. The last factor is the length and degree of the defendant's participation in the scheme. Kandala participated in this scheme for the same amount of time as Sama.

Furthermore, the acts of Sama were reasonably foreseeable to Kandala. Sama referred Kandala to the University. (R.79: Plea Hrg. Tr., 218-219). Kandala worked with Sama and on behalf of him to recruit students. *Id at 221, 223*. And Kandala knew that Sama was also recruiting students. "[A]ctual knowledge necessarily satisfies the lesser reasonable-foreseeability standard." *United States v. Anderson*, 795 F.3d 613, 617 (6th Cir. 2015). Indeed, Kandala was present at the University with Sama, when Sama produced a ledger containing over a 100 recruited students. Therefore, the United States agrees with Probation Department that Kandala should be assessed 9 points under USSG § 2L1.1(b)(2)(C) for harboring 100 or more aliens.

2.    Kandala's sentencing arguments are unavailing

Kandala argues that his role in this offense is "very limited" and "significantly different" than the other defendants. (*Def. Sent. Memo, Pg. 5*). He claims that he did not recruit or refer students to the university and never kept any portion of the $20,000 he put into his jacket. *Id*. To buttress his argument, Kandala produces results of his private polygraph examination.[2] (*Id*. at 6).

---

[2] "Generally, the results of polygraph examinations are inadmissible into evidence." *United States v. Barger,* 931 F.2d 359, 370 (6th Cir.1991). The Sixth Circuit has repeatedly expressed concerns about polygraph result's inherent

However, Kandala overlooks the legal principles of aiding and abetting, minimizes his direct involvement in accepting (and keeping) money - knowing it was for recruiting students to the University, discounts his direct involvement in recruiting 50 students and ignores his admission that he was sending money to India.

To suggest, as the defendant does in his sentencing memorandum, that Kandala is the mere middle-man between Sama and the University, is disingenuous at best. Kandala traveled from California to the University to meet with an undercover agent for the purpose of discussing the recruitment of students and getting paid. Kandala pocketed $20,000. And he kept a portion of that money, which incidentally demonstrates the unreliability of his polygraph results. Kandala also facilitated the admission of 50 students during a February 2018 phone call. Kandala argues that his use of the word "we" during that call did not represent a larger role in the conspiracy but rather represented "his association to the University." *Def. Set. Memo, Pg. 9.* Kandala's argument is illogical. When told that he and Sama could only pick 50 students, Kandala expressed despair, "Only 50? Oh my God...there is a lot of students…hundred students" – hardly an appropriate response from a person who is "not part of the team." *(Id)*. Finally, Sama acknowledged at his plea hearing that Kandala *did* recruit students, was his partner

---

unreliability. *Id.*)." *United States v. Duncan*, 2011 WL 6812819 (E.D. Mich., Southern Division 2011).

and split money equally with Kandala. (R.80: Sama Plea Hrg. Tr., 270).

Therefore, Kandala's conduct necessitates a guidelines sentence, and there are no legitimate reasons to vary below that range. PSR ¶ 69. Nonetheless, under our immigration laws, Kandala must be sentenced to at least 12 months in custody to permanently bar him from re-entering the United States. Such a bar is certainly fitting in this case, since Kandala intentionally exploited our student visa system for his own financial gain. He did so with the full knowledge that most of his recruits wanted to illegally enter the United States job market while unlawfully remaining in the United States. As a direct result of his actions, his recruited students—who were illegally working in the United States—deprived otherwise qualified individuals from obtaining employment or training.

### B.    Sentencing Reform Act factors

#### 1.    Seriousness of the offense

Kandala's decision to conspire to harbor aliens and commit visa fraud is a serious offense, as indicated by Congress's decision to authorize up to five years in prison for the offense. *See* 18 U.S.C. § 371; (PSR, ¶ 53). Specifically in this case, the F-1 student visa program is designed to promote and encourage foreign students to study at American institutions. (PSR, ¶¶ 7–13). Once they finish their course of study, the students must leave within 15 days. (*Id.* at ¶ 13). The idea is that the students return to their native countries to share their new knowledge and skills for

the betterment of themselves and their country. Accordingly, the F-1 student visa program is not a naturalization program—i.e., it is not intended to be a path to obtaining U.S. citizenship.

If he receives a guidelines sentence, Kandala will be deported once he serves his sentence, and he will be permanently barred from returning to the United States in the future. And even without a permanent bar from a guidelines sentence, Kandala will likely be deported, and there is no way to know whether he will return to the United States. Yet his likely deportation should not trigger a variance windfall.

The Sixth Circuit has been clear that 18 U.S.C. § 3553 requires that the defendant's sentence reflect the seriousness of the offense, promote respect for the law, and provide just punishment. *United States v. Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014). Deportation is not part of the defendant's sentence. Many things that happen to a defendant following his conviction and sentence are "impermissible facts" in determining a sentence. *Id.* Things such as losing a professional license, paying legal fees, suffering embarrassment or a damaged reputation, or as is the case here, being deported, are not part of this Court's sentence.  "None of these things are [the defendant's] sentence. Nor are they consequences of his sentence," and a district court should therefore sentence the defendant "without considering these factors." *Id.*

Furthermore, Kandala and his co-conspirators ignored the purpose of the F-1

18

student visa program. In fact, Kandala has remained in the United States since 2015, totaling over four years in the United States before he was arrested on January 31, 2019. (*Id.* at ¶ 2). During his time with the University, Kandala illegally obtained employment as a software engineer making approximately $61,500 a year. (*Id.* at ¶ 51). Those jobs could have gone to U.S. citizens or to other foreign students who were lawfully in the United States on valid visas.

### 2. Deterrence, protection of the public, and nature and circumstances of the offense

As noted above, Kandala will likely be deported, and thus the likelihood of him re-engaging this same criminal conduct is highly unlikely. However, the Court's contemplation of §3553 factors regarding deterrence and protection of the public is not solely limited to whether the defendant is likely to be a recidivist. Rather, this Court is likewise required, in determining an appropriate sentence, to seek to deter others from committing such crimes and protect the public. This Court should do so in this instance. According to an SEVP summary issued by U.S. Immigration and Customs Enforcement in November 2016, 1.23 million foreign students were studying in the United States on student visas in 2016, and 8697 schools were certified to enroll international students.[3] A within guideline sentence for Kandala would invariably serve as a warning and act as deterrence to any of the other one

---

[3] https://www.ice.gov/doclib/sevis/pdf/byTheNumbersDec2016.pdf (p.2).

million other foreign students that are currently studying on student visas in the United States who may contemplate engaging in similar such conduct.

Additionally, this action and the related actions—19-cr-20024 and 19-cr-20025—have garnered considerable media attention since the indictments were unsealed. Presumably, the sentences in this case and the related cases will also receive media focus. As a result, strong sentences against Kandala and the other defendants would have a considerable chance of deterring other foreign students—and some schools—from abusing the F-1 student visa program. In addition, as indicated by the success Kandala and the other defendants had in recruiting students to the University, their vast network of students and potential students, at the very least, could be deterred by guidelines sentences.

In light of the above, a deterrent prison sentence between 33 and 41 months is appropriate.

### 3.      Characteristics of the defendant

Kandala indicated that he has a loving and supportive family in India. PSR ¶ 43).  He attended a university in India and obtained a degree in engineering, and he also earned a Master's degree from Northwestern Polytechnic University. PSR ¶ 49.  Thus, he has received support, love, and opportunities that many defendants who appear before this Court have not, and yet he still chose to commit the instant offense. As a result, Kandala's personal characteristics counsel that a prison sentence

of 33–41 months is appropriate.

### 4.    Need to avoid sentencing disparities

The Supreme Court reiterated in *Booker* that reducing sentencing disparities was Congress's basis statutory goal in passing the Federal Sentencing Guidelines. *United States v. Booker*, 543 U.S. 220, 250, 264 (2005). Thus, calculating and analyzing the guidelines is the primary driver in avoiding unwanted sentencing disparities. *Id.* at 264 ("The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing."). Indeed, by correctly calculating and considering the Sentencing Guidelines, the Court automatically gives "significant weight and consideration to the need to avoid unwarranted disparities." *Gall v. United States*, 552 U.S. 38, 54 (2007). A variance in this matter would result in unwanted sentencing disparities.

Furthermore, a variance based on deportation would be contrary to the dictates of 18 U.S.C. § 3553 (2)(A) which requires that the defendant's sentence reflect the seriousness of the offense (see above). By allowing the Court to consider deportation as grounds for a downward variance for illegally harboring aliens, it would invariably grant the Court the authority to vary for an alien yet bar similar such consideration for an equally culpable defendant, who happens to be a U.S. citizen, and not subject to deportation. In essence, it would reward an alien while punishing a United States citizen for committing the exact same offense. This is universally

unfair and would likewise run afoul of 18 U.S.C. Section 3553(a)(6) which mandates that the Court's sentence should "… avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

Here, Kandala sought to abuse the student visa program so that he could remain and work in the United States illegally. While illegally present in the United States he chose to line his own pockets when he harboring and recruited (or assisted Sama in doing so) other foreign students to do the same. Such calculated criminal acts do not warrant a downward variance.

Therefore, this factor favors a prison sentence within the guidelines range of 33–41 months. However, the Court should also be mindful of the five other recruiters charged in this case, along with the two recruiters charged in related cases, 19-cr-20024 and 19-cr-20025. Naveen Prathipati, who recruited less than twenty students, received a sentence of 12 months and a day, and Bharath Kakireddy, who was a co-conspirator with Sama and Kandala, received a sentence of 18 months. Kakireddy, like Kandala, helped enlist hundreds of foreign citizens to enroll at the University with the goal of fraudulently maintaining their status in the United States.

## III.    CONCLUSION

For the reasons stated above, the government recommends this Court sentence Kandala within the existing guideline range of 33–41 months.

Respectfully submitted,

MATTHEW SCHNEIDER
United States Attorney

*/s/ Timothy P. McDonald*
Timothy P. McDonald
Ronald W. Waterstreet
Brandon C. Helms
Assistant United States Attorneys
211 W. Fort Street, Suite 2001
Detroit, MI   48226
Phone: (313) 226.9100
Email: Ronald.Waterstreet@usdoj.gov
Email: Timothy. McDonald@usdoj.gov
Email: Brandon.Helms@usdoj.gov

Dated: August 29, 2019

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 29, 2019, I electronically filed the foregoing

paper with the Clerk of the Court using the ECF system, which will provide

notification to all counsel of record.


_/s/Timothy P. McDonald_
Timothy P. McDonald
Assistant United States Attorney